No. **SR-CV-949-83**
# District Court of the Navajo Nation
Judicial District of Shiprock, New Mexico

**In Re: Mary Ellis Joe's Customary Use Area,
District 9, Shiprock Agency, Navajo Nation**

**Mary Ellis Joe, C# 20,287, Petitioner,**
**v.**
**Melvin Willie, et al., Respondents.**
**Decided September 26, 1990**

## FINDINGS OF FACT; CONCLUSIONS OF LAW; AND JUDGMENT

## DECISION ON REMAND

Judge Leroy S. Bedonie presiding.

The Navajo Nation Supreme Court remanded this case to adjudicate and determine the matter *de novo*. The Court having heard testimony presented, receiving evidence and being sufficiently advised makes its findings as follows:

## FINDINGS OF FACT

1. The Court has proper subject matter and personal jurisdiction in this cause of action pursuant to 7 NTC Sec. 253(2).

2. On March 9, 1982, Counsel for Mary Ellis Joe, by letter, notified the District Nine (09) Grazing Committee of *competing* claims to grazing land claimed by Petitioner as her customary use area and requested notice to all parties claiming an interest and that the matter be heard by the committee. On June 29, 1982, the Petitioner was notified that the District Grazing Committee had reviewed Petitioner's claim but no decision was reached.

3   On November 10, 1983, the Petitioner filed a quiet title suit in the Shiprock District Court citing the grazing committee's failure to reach a decision. Parties (defendants) claiming interests in the disputed land filed an answer to the petition on December 9, 1983. On April 4, 1984, the Court referred this case to the District #9 Grazing Committee but it decided nothing; therefore, on February 15, 1985, the Court again referred the case to the Resources Committee and on March 27, 1987, this Committee (Resources) entered its decision holding that the Petitioner had "no claim to any area beyond the area authorized by her grazing permit."

4. The Petitioner requested judicial review of the final Resources Committee decision, and on May 29, 1989, the District Court decided not to review a decision of the Resources Committee on grounds it had no jurisdiction. The Petitioner

then filed an appeal with the Supreme Court challenging this Court's decision, and on the 22nd day of March 1990, reversed the decision of the District Court and remanded this case for adjudication and to determine the matter _de novo_.

5. The record shows that the Petitioner, Mary Ellis Joe, is seeking approximately 27,000 acres or 42 square miles. Petitioner currently uses an undisputed area, designated as .0216, within the area claimed by her. The BIA has issued a total of 4 different permits within .0216, for a total of 304 sheep units. Area .0216 is slightly less than one half of the 27,000 acres she is claiming which amounts to roughly 12,000 acres (BIA Land Operations has not conducted a survey on Petitioner's use area .0216). Mary Ellis Joe owns Grazing Permit No. 9-120 for 83 sheep units yearlong within Sweetwater Chapter of Land Management District 9. Mary Ellis Joe testified at trial that she has 80 sheep, 70 goats, 20 cows and 6-7 horses.

6. Mary Ellis Joe's claimed use overlaps into other areas claimed by common heirs. While Respondent Grace Oldman and Mary Ellis Joe share a common father, Mary Ellis Joe also shares a grandfather with Hosteen Bluff City's children, who were alleged to be newcomers at trial. That is, Kitseally's old wife was the daughter of Old Wagon and his first wife. Whereas, Hosteen Bluff City, Jack Banana, Jean Morris and Old Wagon's daughter were children of Old Wagon and his second wife. Clearly, if one goes back far enough most of the respondents are related and technically are not outsiders. Mary Ellis Joe wishes to claim property which might have been grazed at any time during the life of Kitseally or his ancestors.

7. Respondent Grace Oldman testified that she is a daughter of Kitseally's new wife and that she has a right to use the land north of Toh Atin Mesa. She was born and raised on the land to the north of Toh Atin Mesa and has lived there continuously. Mrs. Oldman and her husband, Jake Oldman, own two separate grazing permits in two areas designated .0203 (41 sheep units) and .0202 (63 sheep units) north and northwest of .0216. Grace and Jake Oldman utilize a third permit owned by their son, Casey Oldman, which allows for 78 sheep units in the .0202 area. The grazing permits combined allow for 182 sheep units. Grace testified at trial that she takes care of 52 sheep, 98 goats, 12 cows and 1 horse. Jim Oldman testified that he has 33 sheep, 3 cows, 2 horses and 10 goats.

## CONCLUSIONS OF LAW

1. A grazing permit gives one the right to use the land for grazing, however, "no person is entitled to more range area than needed to support the number of livestock allowed on his or her grazing permit" as set forth in the _1957 Navajo Reservation Grazing Handbook_ at page 14. The primary purpose of grazing permits is to control the number of livestock to protect and preserve the land. Mary Ellis Joe testified that she has a grazing permit which allows her to have 83 sheep units. However, according to her testimony, she maintains 150 goats and sheep,

20 cows and 6-7 horses. One cow or one horse is equal to 5 sheep units; therefore, 27 cows and horses would be equivalent to 135 sheep units. Mary Ellis Joe currently grazes 285 sheep units on an 83 sheep unit permit. Note, under the current poor grazing conditions, she alone needs 17,100 acres to support 285 sheep units. At trial, Mary Ellis Joe alleged that the respondents were responsible for depletion of grass. But, Mary Ellis Joe is also contributing to the poor conditions especially in light of Mr. Randy D. Cornett's testimony that the number of livestock is down played by the owners. To exacerbate the situation, there are three other permittees who are allowed 221 sheep units. It is not unreasonable to conclude that these other valid permittees within .0216 are also grazing beyond their limits and thus contributing to the poor grazing conditions in violation of the Navajo land policy.

2. Initially, grazing permits were issued to persons who had livestock and could identify customary use to a specified area. Customary use is a Navajo concept that defines an individual Navajo's prescribed boundary for the use and occupancy of land to an area traditionally inhabited by his/her ancestors. *In The Matter Of The Estate Of: Charley Nez Wauneka, Sr.*, 5 Nav. R. 79, 81 (1987). Grazing permits were also issued to those people who claimed a specific area of land known as "claimed use area."

3. A grazing permit is one of the most important items of property a Navajo can own. *Estate of Navajo Joe*, 4 Nav. R. 99 (1983). Grazing permits are extremely valuable property due to the limited land base, and land use rights are embodied by the permit.

4. Grazing permits changed the nature of customary use in some cases, because Navajo people outside the ancestral pool can obtain grazing privilege by gift or purchase. The Navajo Supreme Court held that a grazing permit is the functional equivalent of a deed and is therefore an instrument which transfers real property. *In the Matter of the Estate of Joe Dee Nelson*, 1 Nav. R. 162 (1977). Characterizing grazing permits as deeds allows for conveyance of grazing permits by gift, purchase or inheritance. Thus, those Navajos who follow the tradition of customary use to a particular area based on ancestral use will necessarily clash with "outsiders" who have bought or received a permit by gift.

5. Grazing permits, from inception, have been controversial and fraught with conflict. The Court will not address the issue of whether the Bureau of Indian Affairs and district grazing committees are consistent with each other nor will it concern itself with other administrative problems. The Court will, however, adhere to the Navajo land policy adopted by the Navajo Supreme Court. The Court recognizes that land is a resource and the increasing pressure on the land threatens its viability. Hence, the primary goal of the Navajo land policy is to keep the land economically viable.

The Court is faced with the extremely difficult and emotional issue of land disputes. Land to the Navajo people is life which embodies the concept of spiri-

tual, mental, physical and emotional well being. Navajo thinking and values accord land with survival and sustenance. Since the Long Walk, Navajos have maintained a subsistence life-style based on livestock production, which livestock ownership among the Navajo is a symbol of wealth, prestige, and stability.

Since land plays a central and sacred role in the Navajo culture, it follows that the Navajo will fight long and hard for their land. Many of the land disputes arising on the Navajo Nation are between common relatives and between siblings. The rapid population growth of the Navajos, along with a strong cultural tradition of having land with livestock and a home where they grew up, inevitably causes land disputes. The Navajo population has increased from approximately 9,000 (upon return from Ft. Sumner) to 169,157 in 1989. See *Chapter Images: 1989, General Facts on Navajo Chapters*, May 1990, Larry Rodgers, Division of Community Development, Window Rock, Arizona.

Evidence of the spiritual and mental tie to livestock ownership clearly surfaced when the government forced Navajos to reduce their stock by 64 to 80 percent during the late 1930's and early 1940's. Navajos were devastated by the massive killing and irreverent conduct by government officials. See *Navajo Livestock Reduction: A National Disgrace*, Navajo Community College Press, 1974. The purported purpose of the stock reduction was to restore the land which had been overgrazed by an over abundance of livestock. This era initiated a reservation-wide grazing policy which gave birth to the grazing permit in 1937. The majority of Navajos reacted strongly against the regulation of grazing and grazing permits, but it was eventually accepted. The maximum amount of permissible sheep units an individual Navajo could receive was set at 350 to be authorized by the Bureau of Indian Affairs.

Unfortunately, when dealing with the ancestral use of the land, we must look to the family tree which gets ever wider with more and more people, who all claim to have use rights by virtue of common ancestors. This is exactly what we are faced with in this case. Petitioner Mary Ellis Joe is the daughter of Hosteen Kitseally's old wife and Respondent Grace Oldman is the daughter of Hosteen Kitseally's new wife. When Hosteen Kitseally separated from his old wife and began to live exclusively with his new wife, he gave his old wife the majority of the sheep and the land to her right as she faced east on top of Toh Atin Mesa. Hosteen Kitseally, with his new wife, moved to the North of Toh Atin Mesa and began to build the herd again. When boundaries are not delineated by fences, it is possible Mary Ellis Joe may have grazed at one time or another on the land north of Toh Atin Mesa and further south and west of the .0216 area. But, when such a claim is made, we have to look to the rights of the other descendants of common ancestors in light of the Navajo land policy.

The semi-desert region of Navajoland requires livestock control to protect the land from becoming a wasteland. Although the amount of stock owned by individual Navajos is much less than what it was prior to forced stock reduction fifty-five years ago, the Navajo population has almost quadrupled since the issuance

of grazing permits in 1940. See *Navajo Nation FAX 88: A Statistical Abstract* p.2, September 1988, Division of Community Development, Window Rock, Arizona. Within Shiprock Agency District 9, the population was estimated to be 2,285 in 1940 and 4,994 in 1980 - a 118.56% increase. It is projected to increase to 6,242 by 1988. See *Navajo Nation FAX, id.* at p.7.

The 27,000 acres claimed by Mary Ellis Joe disturbs the Court for the following reasons. The estimated land size of Sweetwater Chapter is 152,006.30 acres. Her claim amounts to over one fifth of the Sweetwater Chapter area within District 9. The estimated 1989 Sweetwater population is 1,698. See *Chapter Images* 1989 at p.104. To grant Mary Ellis Joe her claim of 27,000 acres would not only deny the rights of descendants who have been born and raised in the area, but it would grant Mary Ellis Joe a special privilege which is no longer practical or realistic. Almost every middle aged Navajo sheep owner can recall when their families made seasonal herds over great distances and could probably show reminisces of camps upon request. The tremendous increase in population has rendered it inequitable for any one Navajo or family to continue that lifestyle because in effect, it would force 90 percent of the remaining Navajos to forfeit their identity with the land. It's unlikely that a subsistence life-style entirely based on raising stock is possible because of the massive land base that is required to make it profitable without destroying grazing land.

Although, time has changed the extent of subsistence livestock economy of the Navajo people, stockraising today retains its traditional position. Many young educated Navajos trained in various fields have sources of income other than subsistence stockraising. Contrary to what the officials from the Bureau of Indian Affairs had hoped for forty years ago, many of these Navajos have inherited the Navajo way of thinking. They maintain ties to the land and value stockraising, even if it is just one sheep, one horse or one cow and return back to where they were raised whenever possible. The BIA believed that the spread of education would de-emphasize stockraising. See *The Navajo Year Book, Report No. viii, 1951-1961. A Decade of Progress*, Robert Young, Assistant to the General Superintendent; Navajo Agency, Window Rock, Arizona 1961.

Petitioner contends that those Navajos who reside and graze in the area she is claiming are responsible for the deterioration of grazing land. Petitioner further contends that given the poor range conditions, the 304 sheep units would require 18,240 acres. This figure is based on the testimony given by Randy D. Cornett, Supervisory Range Conservationist, Branch of Natural Resources, Shiprock Agency, Bureau of Indian Affairs. Mr. Cornett estimated that the range condition of the lands in dispute is estimated to be poor north of Toh Atin Mesa and poor to fair in the south. Mr. Cornett stated that given poor conditions, it takes 50 - 60 acres to graze one sheep unit.

The purpose of the Navajo land policy is to keep Navajoland economically viable. The problem of overgrazing is widespread and each individual Navajo should take responsibility to protect our Nation from becoming a wasteland. This

can be achieved by controlling the amount of livestock or giving them supplemental feed or both. This Court is not in the position to promulgate rules and regulations that may reconcile customary use claims with grazing permits. Nor is this Court responsible for the enforcement of grazing regulations. This Court suggests to the lawmaking body to create a competent administrative agency to hear and determine land disputes. That Navajo Nation administrative agency can promulgate procedures which guarantee due process and rights guaranteed by the Navajo Bill of Rights and Indian Civil Rights Act.

## JUDGMENT

Mary Ellis Joe will not be allowed to claim more land than could have been claimed by her mother, Kitseally's old wife. The original 1940 Bureau of Indian Affairs map of the area in dispute shows that Kitseally's old wife had a customary use area designated as .0216 as shown on Petitioner's Exhibit "1." This will be the land allowed to be claimed by Mary Ellis Joe.

THUS ORDERED this 24th day of September, 1990.